# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 39204-2011

| | | |
|---|---|---|
| DARRYL HARRIS and CHRISTINE HARRIS, husband and wife, | ) ) ) | Boise, February 2013 Term |
| Plaintiffs-Appellants, | ) ) | 2013 Opinion No. 36 |
| v. | ) ) | Filed: March 29, 2013 |
| THE BANK OF COMMERCE, an Idaho corporation, | ) ) ) | Stephen W. Kenyon, Clerk |
| Defendant-Respondent, | ) ) | |
| and | ) ) | |
| DUANE L. YOST and LORI YOST, husband and wife; DUANE L. YOST as Trustee of the DUANE L. YOST TRUST, | ) ) ) ) | |
| Defendants. | ) ) | |

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, in and for Bonneville County. The Hon. Dane H. Watkins, District Judge.

The judgment of the district court is affirmed.

Kipp Manwaring, Manwaring Law Office, Idaho Falls, argued for appellants.

Brian T. Tucker, Nelson Hall Parry Tucker, Idaho Falls, argued for respondent.

---

EISMANN, Justice.

This is an appeal out of Bonneville County from a summary judgment upholding the validity of a bank's mortgage in real property that the plaintiffs had sold to the mortgagor in exchange for an interest in an investment account that turned out to be a Ponzi scheme. We affirm the judgment of the district court.

# I.

## Factual Background.

Darryl and Christine Harris owned as community property approximately 80 acres of rural land in Bonneville County. In the summer of 2007, Mr. Harris began discussions with Duane Yost and Steve Crandall about developing the land. They contemplated having the Harrises sell 40 of the 80 acres to Mr. and Mrs. Yost and the Yosts and Harrises then transferring their respective 40-acre parcels into a limited liability company that would develop the land.

In furtherance of the contemplated development, Mr. Harris agreed to sell the 40 acres to Mr. Yost for $800,000. They both had accounts with the Trigon Group, Inc., an investment business. They agreed that Mr. Yost would pay for the property by transferring $800,000 of his account with the Trigon Group to Mr. Harris's account, which Mr. Yost did on October 1, 2007. At that time, they believed they had millions of dollars in their respective accounts. During the period from October 17, 2003, through October 14, 2008, Mr. Harris had invested over $6 million with the Trigon Group and had withdrawn about $2.3 million. In their 2007 financial statement, the Yosts stated that they had $18.5 million in their account with Trigon Group.

In September 2008, the Bank of Commerce met with the Harrises regarding loans that their sons were seeking in order to purchase the Harrises' business. The Bank wanted security for the loans, and as part of that process it had ordered an appraisal of the 80 acres. Mr. Harris informed the Bank that the appraisal should only be for 40 acres because the other 40 acres belonged to the Yosts. Mr. Harris explained that the documents for the transfer of the parcel to the Yosts had not been completed properly and that they were in the process of making sure that the county records reflected that the property was in the Yosts' names. In order to help their sons obtain the loan, the Harrises later signed a deed of trust granting the Bank a security interest in the 40 acres they retained.

As a result of the economic downturn in the latter part of 2008, the Bank was seeking to collateralize its unsecured loans. In April 2008, the Yosts had obtained a $2 million unsecured loan from the Bank, and in July 2008 they had obtained a short-term, $1 million unsecured loan. The latter loan was due in September, but the Bank extended the due date to October 15, 2008. The Yosts had intended to pay that loan by withdrawing funds from their account with the Trigon Group, but they had not yet received those funds. As they were working with the Bank to provide security for their loans, they realized that they had not received a deed to the 40-acre

parcel. Despite a title commitment showing that the Harrises were the record owners of the property, in order to obtain security for the $1 million loan the Bank had the Yosts execute a deed of trust on November 21, 2008, which was recorded the same day. In late November, Mr. Yost told Mr. Harris that he needed a deed to the 40 acres to satisfy the Bank's demands for security. On November 25, 2008, Mr. Harris signed a quitclaim deed conveying the property to the Duane L. Yost Trust, and Mr. Yost recorded the deed on the same day.

The Bank's title company informed it that the property needed to be deeded to the Yosts, not to the trust, and that Mrs. Harris needed to sign the deed. The Bank prepared a corrected quitclaim deed, and on December 1, 2008, Mr. Yost and Mr. Harris met at attorney Robert Crandall's office. Mr. Harris signed the corrected deed, but he was unable to contact his wife to have her sign it. He then signed her name and left the deed with the attorney, who notarized both signatures and recorded the deed the following day. The Yosts also signed a deed of trust to the 40-acre property as security for their $2 million loan from the Bank. A few weeks later, Mr. Harris told Mrs. Harris that he had signed her name to the deed, and she responded by simply shrugging her shoulders and saying, "Okay." She testified that when he told her he had forged her name on the deed, it did not bother her and she trusted him because he knew what he was doing. She also testified that she did not do anything about it. Mr. Harris testified that he knew the Bank would rely on the corrected deed in securing its loan to the Yosts.

The Yosts had informed the Bank that they would be receiving money from the Trigon Group to pay their loans. In an effort to assist the Yosts, a group of investors in the Trigon Group and their accountants met with the Bank on December 8, 2008, and assured the Bank that the accountants had done due diligence, that Trigon Group was legitimate, and that although the economic downturn had damaged the fund, it still had $8 million to $10 million to return to investors.

On January 2, 2009, Messrs. Harris and Yost learned that the money they had invested with the Trigon Group was gone. Shortly thereafter, they learned that Trigon Group was a Ponzi scheme operated by Daren Palmer, who was later convicted of federal crimes.

On June 12, 2009, the Harrises filed this action against the Yosts, their trust, and the Bank. The Harrises alleged six claims for relief: (1) they had a vendor's lien in the 40 acres sold to the Yosts in the amount of the $800,000 sale price; (2) they had an equitable mortgage in that property securing the $800,000 sale price; (3) they were entitled to rescind the sale to the Yosts

for lack or failure of consideration; (4) they were entitled to rescind the sale to the Yosts due to a mutual mistake that the Trigon Group was solvent; (5) with the rescission of the sale, they were entitled to judgment quieting their title in the property free of any claims of the Yosts or the Bank; and (6) the quitclaim deed to the Yosts could be construed as a mortgage pursuant to Idaho Code section 45-904. They also alleged that they were entitled to foreclose their vendor's lien, their equitable mortgage, and their deed construed as a mortgage. The Yosts did not appear in the action, and on October 16, 2009, the Harrises obtained a judgment against them and their trust for the allegedly unpaid purchase price of $800,000, plus interest, court costs, and attorney fees. The Bank filed a counterclaim against the Harrises and a cross claim against the Yosts seeking a judgment against the Yosts for the sums they owed the Bank, a judgment that the Bank's interest in the property is superior to any interest of the Harrises, and the foreclosure of the Bank's deeds of trust.

The Bank and the Harrises both moved for summary judgment. In their memorandum filed on November 18, 2010, opposing the Bank's motion for summary judgment, the Harrises raised for the first time the assertion that the corrected deed to the Yosts was invalid under Idaho Code section 32-912 because Mrs. Harris had not signed the deed. After briefing and oral argument, the district court issued a memorandum decision and order granting the Bank's motion for summary judgment and denying the Harrises' motion. The district court entered a judgment in the Bank's favor on June 7, 2011, and the Harrises timely appealed.

**II.**
**Did the District Court Err in Holding that the Deed to the Yosts Was Not Void?**

The Harrises assert that the district court erred in holding that the Deed to the Yosts was not void for lack of consideration, for lack of delivery, and for lack of Mrs. Harris' signature on the deed. They argue that they did not receive any consideration because the Yosts' $800,000 interest in their investment account with the Trigon Group turned out to be worthless. Mr. Harris testified that he "assumed that was real money, which it later proved out not to be." They argue that there was no delivery of the deed because Mr. Harris was initially reluctant to transfer the property due to investors' recent difficulties in withdrawing funds from the Trigon Group, but he signed the deed after Mr. Yost showed him a copy of a fax stating that $125 million was about to be transferred to one of Daren Palmer's entities, which allayed Mr. Harris's suspicions about

4

Trigon Group. They contend that since he signed the deed upon assurances that the Trigon Group was financially sound, the delivery of the deed was conditioned upon the investment account transferred to them by the Yosts being worth $800,000. Finally, they argue that the district court erred in holding that Mrs. Harris was estopped from asserting that the deed was voidable under Idaho Code section 32-912.

We need not address these issues because the Harrises have waived any claim they may have had that the deed to the Yosts could be set aside. Upon a vendee's breach of a real estate contract, the vendor has three possible remedies: (a) rescind the transaction; (b) sue for the balance owing on the purchase price; or (c) sue for damages measured by the difference between the contract price and the market value of the property at the time of the breach, unless the contract provides otherwise. *Koch v. Glenn*, 53 Idaho 761, 764, 27 P.2d 870, 871 (1933).

Although the vendor can bring an action seeking inconsistent remedies, *Gridley v. Ross*, 37 Idaho 693, 701, 217 P. 989, 990 (1923), the vendor cannot obtain a judgment for inconsistent remedies, *Sunderlin v. Warner*, 42 Idaho 479, 490, 246 P. 1, 5 (1926). The vendor cannot obtain judgments that both affirm the sale of the real property and rescind the sale.

In *Sunderlin*, the Johnsons agreed to exchange their farm land for the Sunderlins' home in town and household goods plus $4,500 payable over time. *Id*. at 483-84, 246 P. at 2-3. The deeds were placed in escrow because the Johnsons were litigating title to the farm land. *Id*. The parties' contract provided that if the Johnsons did not obtain title to the farm land, then they would buy the Sunderlins' home for $10,000. *Id*. Before that litigation was finally resolved, the escrow holder became insolvent, and its liquidation agent took possession of the escrow documents. *Id*. at 484-85, 246 P. at 3. He wrongly delivered the deed signed by the Sunderlins to the Johnsons, and they then sold the Sunderlins' property to a third party. *Id*. After the Johnsons lost their court case, the Sunderlins filed an action against Mr. Johnson for the balance owing on the purchase price of the property and against the liquidation agent and his surety for wrongful delivery of the deed to the Johnsons. *Id*. at 485, 246 P. at 3. The Sunderlins obtained a default judgment against Mr. Johnson for the balance owing on the purchase price of the property. *Id*. at 486, 246 P. at 3. The Sunderlins' action against the liquidation agent and his surety proceeded to trial. The trial court dismissed their lawsuit at the close of their case in chief on the defendants' motion for nonsuit, and the Sunderlins appealed. *Id*. at 488, 246 P. at 4. We held that having obtained a default judgment against Mr. Johnson for the balance owing on the

purchase price, the Sunderlins could not pursue a claim against the liquidation agent and his surety based upon the wrongful delivery of the deed. In so holding, we stated as follows:

> It is apparent that when appellants [the Sunderlins] recovered a judgment for the value of this house and lot upon implied contract, the Johnsons having obtained title to the same by the alleged wrongful delivery of the deed, appellants must be deemed to have elected to affirm the conveyance and recover for the purchase price of the property. This form of action is inconsistent with their subsequent election to sue respondents Warner [the liquidation agent] and National Surety Company *ex delicto* for a wrongful delivery of the deed. They could only recover in an action of contract on the theory that they had elected to ratify a delivery of the deed. *They cannot contend that they had a right of recovery against the Johnsons for the value of the property, and against Warner* [the liquidation agent] *and his surety for having wrongfully delivered the deed which conveyed the property to the Johnsons*.

*Id*. at 490, 246 P. at 5 (emphasis added).

This Court added that by obtaining a judgment for the purchase price, the Sunderlins had ratified the delivery of the deed to the Johnsons and they could only maintain a lawsuit on the ground that the deed was valid. We stated:

> The delivery of a deed to the grantee without his performing the condition upon which his right to receive it depended vested no title in him, and the grantor has a right of action to recover it or have it canceled as a cloud upon his title, but after he brings a suit against the grantee *ex contractu* and recovers a judgment for the purchase price, he thereby ratifies the act of delivering the deed, as such suit could only be maintained upon the ground that the deed was valid.

*Id*. at 491, 246 P. at 5.

The Harrises obtained a judgment entered on October 16, 2009, against the Yosts and their trust for what they contended was the balance owing for the purchase of the 40 acres ($800,000 plus interest). That judgment became final on June 7, 2010, when a judgment was entered on the remaining causes of action in this lawsuit. Having obtained a final judgment that was based on the theory that the property was validly transferred to the Yosts, the Harrises cannot pursue a claim against the Bank on the theory that the deed to the Yosts should be rescinded or was void.

### III.
### Did the District Court Err in Holding that the Bank
### Was an Encumbrancer in Good Faith?

"One who sells real property has a vendor's lien thereon, independent of possession, for so much of the price as remains unpaid and unsecured otherwise than by the personal obligation of the buyer." I.C. § 45-801. Vendor's liens "are valid against every one claiming under the debtor, except a purchaser or encumbrancer in good faith and for value." I.C. § 45-803. With respect to the Harrises' claimed vendor's lien in the property,[1] there must be evidence that the Bank had notice that the purchase price for the land remained unpaid. *See Benz v. D.L. Evans Bank*, 152 Idaho 215, 228, 268 P.3d 1167, 1180 (2012) (where bank had notice that contract purchaser of property had paid a portion of the purchase price, bank was not a good faith encumbrancer).

Prior to taking its deed of trust, Mr. Harris had told the Bank that the Yosts owned the property and that the Harrises were in the process of making sure that the county records reflected that the property was in the Yosts' names. The Bank also knew of the quitclaim deed, which stated that Mr. Harris "hereby RELEASES, and Forever QUITCLAIMS to the Duane L. Yost Trust, Grantee, for good and valuable consideration the following described tract of land." The Bank also knew of the corrected quitclaim deed, which stated that the Harrises "hereby RELEASE[], and Forever QUITCLAIM[] to Duane Yost and Lori Yost, Grantees, for good and valuable consideration the following described tract of land." Nothing in either deed indicated that there was any portion of the purchase price remaining unpaid. Indeed, the Harrises do not contend that the Bank had knowledge of what the consideration for the deed was, much less whether the Harrises had received the promised consideration.

Rather, they contend that the Bank should have known that the Yosts still owed the Harrises the purchase price of the property.[2] They argue that the Bank knew that the Yosts'

---

[1] The Harrises also claim that their deed to the Yosts was an equitable mortgage and a mortgage under Idaho Code section 45-904. Both of those claims require that there be a debt owing from the grantor to the grantee that continues after the delivery of the deed. *Dickens v. Heston*, 53 Idaho 91, 100, 21 P.2d 905, 908 (1933) (discussing the requirements for an equitable mortgage, "The controlling test to be applied in determining whether a given instrument is a mortgage is whether at the time of the execution of the deed the grantor sustains the relation of debtor to the grantee."); *Fond v. McCreery*, 55 Idaho 144, 151, 39 P.2d 766, 768 (1934) (construing the predecessor of section 45-904, "It is true an existing debt, owing from the grantor to the grantee in a deed, is indispensable to the instrument being construed to be a mortgage."). There is no assertion that the Harrises (grantors) owed a debt to the Yosts (grantees), and therefore the deed to the Yosts cannot constitute a mortgage.

[2] The evidence indicates that the Harrises received exactly the consideration for which they bargained—the transfer to them of a portion of the Yosts' investment account with the Trigon Group. Mr. Harris testified that Mr. Yost did not agree to pay cash or write a check for the purchase price, but simply stated that he would transfer $800,000 of his investment account to the Harrises' investment account, and Mr. Yost accepted that as payment, although he also

7

financial statement showed that 90% of their wealth consisted of their investments in the Trigon Group and the Bank was therefore on notice that the Trigon Group was the sole source of the Yosts' ability to acquire additional assets. The Harrises also assert that because the Bank knew that some of its customers had received insufficient funds checks from the Trigon Group, the Bank was on notice that Trigon Group's financial stability was questionable. According to the Harrises, the Bank should have conducted further inquiry into the Yosts' financial dealings and the Trigon Group's solvency, and had it done so it could have concluded that the Yosts must have paid for the property with a portion of their investment account with the Trigon Group, which the Bank could have determined was not worth the $800,000 purchase price. This imaginative argument is not sufficient to show that the Bank knew or had notice of the Harrises' claimed vendor's lien.

The Harrises also argue that the Bank had constructive notice of the Harrises' vendor's lien because the Bank's president admitted that in 2008 he drove past the 40-acre parcel that had been sold to the Yosts and the president "noted Yost was not in apparent possession and the property was being farmed." Actually, the president testified that he drove past the property and saw that it was farm ground. The Harrises' counsel then asked, "Didn't appear to be anybody occupying or possessing it otherwise?" and the president answered, "Well, it was in crop." He then admitted that there was no house on it. The Harrises do not explain how the president seeing that the land was being farmed would provide notice that the Harrises had allegedly not been paid the entire purchase price.

## IV.
### Is the Bank Entitled to Attorney Fees on Appeal?

The Bank contends that it is entitled to an award of attorney fees on appeal. First, it contends that it is entitled to an award of attorney fees pursuant to the terms of the promissory note and deeds of trust signed by the Yosts. Because the Harrises did not sign those documents, they do not obligate the Harrises to pay the Bank attorney fees.

The Bank also contends that it is entitled to an award of attorney fees under Idaho Code section 12-120(3) on two grounds. That statute entitles the prevailing party to an award of

---

testified that he "assumed that that was real money." However, we need not address whether the Harrises would have any other claim against the Yosts once the parties learned that the investment account was not worth $800,000.

attorney fees in "any civil action to recover on . . . [a] note . . . and in any commercial transaction."  This is not an action to recover on any note upon which the Harrises are liable.  Likewise, there was no claim of a commercial transaction between the Harrises and the Bank.  Therefore, the Bank is not entitled to an award of attorney fees on appeal.

## V.
## Conclusion.

We affirm the judgment of the district court.  We award the respondent costs, but not attorney fees, on appeal.

Chief Justice BURDICK, Justices J. JONES, W. JONES, and HORTON **CONCUR.**